HOOVER SLOVACEK LLP, Formerly
Hoover, Bax & Slovacek, LLP,
Petitioner,

v.

John B. WALTON, Jr., Respondent.

No. 04–1004.

Supreme Court of Texas.

Argued Dec. 1, 2005.

Delivered Nov. 3, 2006.

Mike A. Hatchell, Molly H. Hatchell, Charles R. Watson Jr., Locke Liddell & Sapp, LLP, Thomas R. Phillips, Baker Botts L.L.P., Austin, and Steven L.

Hughes, Mounce, Green, Myers, Safi & Galatzan, El Paso, for Petitioner.

John M. Phalen Jr., Daniel J. Sheehan Jr., Michael L. Atchley, Daniel Sheehan & Associates, L.L.P., Dallas, for Respondent.

Chief Justice JEFFERSON delivered the opinion of the Court, in which Justice O'NEILL, Justice WAINWRIGHT, Justice BRISTER, Justice GREEN, and Justice JOHNSON joined.

We deny Walton's motion for rehearing and grant Hoover Slovacek's motion for rehearing. We withdraw our opinion of June 30, 2006 and substitute the following in its place.

In this case, we must determine whether an attorney hired on a contingent-fee basis may include in the fee agreement a provision stating that, in the event the attorney is discharged before completing the representation, the client must immediately pay a fee equal to the present value of the attorney's interest in the client's claim. We conclude that this termination fee provision is contrary to public policy and unenforceable. We affirm the court of appeals' judgment in part, reverse in part, and remand to the court of appeals for further proceedings.

## I

### Background

In June 1995, John B. Walton, Jr. hired attorney Steve Parrott of Hoover Slovacek LLP (Hoover) to recover unpaid royalties from several oil and gas companies operating on his 32,500 acre ranch in Winkler County. The engagement letter granted Hoover a 30% contingent fee for all claims on which collection was achieved through one trial. Most significantly, the letter included the following provision:

> You may terminate the Firm's legal representation at any time.... Upon termination by You, You agree to immediately pay the Firm the then present value of the Contingent Fee described [herein], plus all Costs then owed to the Firm, plus subsequent legal fees [incurred to transfer the representation to another firm and withdraw from litigation].

Shortly after signing the contract, Walton and Parrott agreed to hire Kevin Jackson as local counsel and reduced Hoover's contingent fee to 28.66%. Parrott negotiated settlements exceeding $200,000 with Texaco and El Paso Natural Gas, and Walton paid Hoover its contingent fee. Parrott then turned to Walton's claims against Bass Enterprises Production Company (Bass), and hired accountant Everett Holseth to perform an audit and compile evidence establishing the claims' value.[1] Meanwhile, Walton authorized Parrott to settle his claims against Bass for $8.5 million.

In January 1997, Parrott made an initial settlement demand of $58.5 million. Bass's attorney testified that Parrott was unable to support this number with any legal theories, expert reports, or calculations, and that the demand was so "enormous" he basically "quit listening." The following month, however, Bass offered $6 million not only to settle Walton's claims, but also to purchase the surface estates of eight sections of the Winkler County ranch, acquire numerous easements, and secure Walton's royalty interests under the leases. Walton refused to sell, but authorized Parrott to accept $6 million to settle only Walton's claims for unpaid royalties. Walton also wrote Parrott and ex-

---

1. Holseth never completed the audit, but testified that he estimated the value of Walton's claims at $2 million to $4 million.

pressed discontent that Parrott did not consult him before making the $58.5 million demand. According to Walton, Parrott responded by pressuring him to sell part of the ranch and his royalties for $6 million. In March 1997, Walton discharged Parrott, complaining that Parrott was doing little to prosecute his claims against Bass and had damaged his credibility by making an unauthorized and "absurd" $58.5 million demand.

Walton then retained Andrews & Kurth LLP, which, in November 1998, settled Walton's claims against Bass for $900,000. By that time, Hoover had sent Walton a bill for $1.7 million (28.66% of $6 million), contending that Bass's $6 million offer, and Walton's subsequent authorization to settle for that amount, established the present value of Walton's claims at the time of discharge. Walton paid Andrews & Kurth approximately $283,000 in hourly fees and costs, but refused to pay Hoover.

When Hoover sought to intervene in the settlement proceedings between Walton and Bass, the trial court severed Hoover's claim, and the parties tried the case before a jury. Richard Bianchi, a former state district judge in Harris County, testified as Hoover's expert witness. Bianchi opined that a 28.66% contingent fee was, "if anything, lower than normal, but certainly reasonable under these circumstances," and that "it would only be unconscionable to ignore the agreement of the parties." He also testified that charging more than Walton ultimately recovered from Bass "doesn't change the deal they made. That's just a bad business deal."

In contrast, Walton's local counsel, Kevin Jackson, testified that he had never heard of attorneys charging a percentage based on the present value of a claim at the time of discharge rather than the client's actual recovery, and that the $1.7 million fee was unconscionable.

The jury failed to find that Walton discharged Hoover for good cause or that Hoover's fee was unconscionable. The trial court entered judgment on the verdict, which awarded Hoover $900,000.[2] The court of appeals reversed and rendered a take-nothing judgment for Walton, concluding that Hoover's fee agreement was unconscionable as a matter of law. 149 S.W.3d 834, 847. We granted Hoover's petition for review. 49 Tex. Sup.Ct. J. 15 (Oct. 17, 2005). Because our reasoning differs from the court of appeals' in some respects, we affirm its judgment in part, reverse in part, and remand this case to the court of appeals.

## II

### Discussion

■■■■ When interpreting and enforcing attorney-client fee agreements, it is "not enough to simply say that a contract is a contract. There are ethical considerations overlaying the contractual relationship." *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 868 (Tex.2000) (Gonzales, J., concurring and dissenting).

In Texas, we hold attorneys to the highest standards of ethical conduct in their dealings with their clients. The duty is highest when the attorney contracts

2. The jury was instructed to multiply the present value of Walton's claims at the time Hoover was discharged by 28.66%. Thus, the jury presumably valued the claims at $3.14 million ($900,000 / .2866 = $3.14 million). The court of appeals speculated that, because $900,000 is the exact amount for which Walton settled with Bass, perhaps the jury inadvertently failed to multiply this value by 28.66%. 149 S.W.3d 834, 842 n. 3. Walton challenges the legal sufficiency of the evidence supporting the jury's implicit finding that his claims were worth $3.14 million, but because we conclude that Hoover's termination fee provision is unenforceable, we do not reach this issue.

with his or her client or otherwise takes a position adverse to his or her client's interests. As Justice Cardozo observed, "[a fiduciary] is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Accordingly, a lawyer must conduct his or her business with inveterate honesty and loyalty, always keeping the client's best interest in mind.

*Id.* at 866–67 (alteration in original) (citations omitted). The attorney's special responsibility to maintain the highest standards of conduct and fair dealing establishes a professional benchmark that informs much of our analysis in this case.

■ Although contingent fee contracts are increasingly used by businesses and other sophisticated parties, their primary purpose is to allow plaintiffs who cannot afford an attorney to obtain legal services by compensating the attorney from the proceeds of any recovery. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.1997). The contingent fee offers "the potential of a greater fee than might be earned under an hourly billing method" in order to compensate the attorney for the risk that he or she will receive "no fee whatsoever if the case is lost." Id. In exchange, the client is largely protected from incurring a net financial loss in connection with the representation.[3] This risk-sharing feature creates an incentive for lawyers to work diligently and obtain the best results possible.[4] A closely related benefit is the contingent fee's tendency to reduce frivolous litigation by discouraging attorneys from presenting claims that have negative value or otherwise lack merit.[5]

■ In Texas, if an attorney hired on a contingent-fee basis is discharged without cause before the representation is completed, the attorney may seek compensation in quantum meruit or in a suit to enforce the contract by collecting the fee from any damages the client subsequently recovers. *Mandell & Wright v. Thomas*, 441 S.W.2d 841, 847 (Tex.1969) (citing *Myers v. Crockett*, 14 Tex. 257 (1855)). Both remedies are subject to the prohibition against charging or collecting an unconscionable fee. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(a), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. A (TEX. STATE BAR R. art., § 9).[6] Whether a particular fee amount or contingency percentage charged by the attorney is unconscionable under all relevant circumstances of the representation is an issue for the factfinder.[7] *See, e.g., Curtis v. Comm'n for*

3. Depending on the terms of the agreement, clients sometimes pay court costs and other expenses of the litigation.

4. *See* Lester Brickman, *Contingent Fees Without Contingencies:* Hamlet *Without the Prince of Denmark?*, 37 UCLA L. REV. 29, 43 (1989) (arguing that contingent fees are appropriate only in cases where there is a realistic risk of nonrecovery).

5. *See* Ted Schneyer, *Legal–Process Constraints on the Regulation of Lawyers' Contingent Fee Contracts*, 47 DEPAUL L. REV. 371, 389–90 (1998) (arguing that institutional constraints have made regulation of contingent fees excessive and ineffective).

6. Although the Disciplinary Rules do not define standards of civil liability for attorneys, they are persuasive authority outside the context of disciplinary proceedings, and we have applied Rule 1.04 as a rule of decision in disputes concerning attorney's fees. TEX. DISCIPLINARY R. PROF'L CONDUCT preamble ¶ 15; *see also Johnson v. Brewer & Pritchard, P. C.*, 73 S.W.3d 193, 205 (Tex.2002); *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex.1998); *Arthur Andersen*, 945 S.W.2d at 818.

7. Under the Disciplinary Rules, a fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable. TEX. DISCIPLINARY R. PROF'L CONDUCT

*Lawyer Discipline*, 20 S.W.3d 227, 233 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (concluding that the evidence was sufficient to support a finding that a contingent fee equaling 70–100% of the client's recovery was unconscionable). On the other hand, whether a contract, including a fee agreement between attorney and client, is contrary to public policy and unconscionable at the time it is formed is a question of law. *See, e.g.,* Tex. Bus. & Com.Code § 2.302 (courts may refuse to enforce contracts determined to be unconscionable as a matter of law); *Ski River Dev., Inc. v. McCalla,* 167 S.W.3d 121, 136 (Tex.App.-Waco 2005, pet. denied) ("The ultimate question of unconscionability of a contract is one of law, to be decided by the court."); *Pony Express Courier Corp. v. Morris,* 921 S.W.2d 817, 821 (Tex.App.-San Antonio 1996, no writ) (distinguishing procedural and substantive aspects of unconscionability).

Hoover's termination fee provision purported to contract around the *Mandell* remedies in three ways. First, it made no distinction between discharges occurring with or without cause. Second, it assessed the attorney's fee as a percentage of the present value of the client's claim at the time of discharge, discarding the quantum meruit and contingent fee measurements. Finally, it required Walton to pay Hoover the percentage fee immediately at the time of discharge.

■■■■ In allowing the discharged lawyer to collect the contingent fee from any damages the client recovers, *Mandell* complies with the principle that a contingent-fee lawyer "is entitled to receive the specified fee only when and to the extent the client receives payment." ˙Restatement (Third) of the Law Governing Lawyers § 35(2) (2000). Hoover's termination fee, however, sought immediate payment of the firm's contingent interest without regard for when and whether Walton eventually prevailed. Public policy strongly favors a client's freedom to employ a lawyer of his choosing and, except in some instances where counsel is appointed, to discharge the lawyer during the representation for any reason or no reason at all. *See Martin v. Camp,* 219 N.Y. 170, 114 N.E. 46, 48 (1916) (describing this policy as a "firmly established rule which springs from the personal and confidential nature" of the attorney-client relationship); *see also Whiteside v. Griffis & Griffis, P. C.,* 902 S.W.2d 739, 746 (Tex.App.-Austin 1995, writ denied) (noting that the policy supporting a client's freedom to select his attorney precludes the application of commercial standards to agreements that restrict the practice of law); Tex. Disciplinary R. Prof'l Conduct 1.15 cmt. 4 ("A

1.04(a). The reasonableness of a fee is determined by considering all relevant circumstances relating to the representation, including:
 (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly;
 (2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;
 (3) the fee customarily charged in the locality for similar legal services;
 (4) the amount involved and the results obtained;
 (5) the time limitations imposed by the client or by the circumstances;
 (6) the nature and length of the professional relationship with the client;
 (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
 (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.
Tex. Disciplinary R. Prof'l Conduct 1.04(b), *cited in Arthur Andersen,* 945 S.W.2d at 818.

client has the power to discharge a lawyer at any time, with or without cause. . . ."). Nonetheless, we recognize the valid competing interests of an attorney who, like any other professional, expects timely compensation for work performed and results obtained. Thus, attorneys are entitled to protection from clients who would abuse the contingent fee arrangement and avoid duties owed under contract. Striving to respect both interests, *Mandell* provides remedies to the contingent-fee lawyer who is fired without cause. Hoover's termination fee provision, however, in requiring immediate payment of the firm's contingent interest, exceeded *Mandell* and forced the client to liquidate 28.66% of his claim as a penalty for discharging the lawyer. Because this feature imposes an undue burden on the client's ability to change counsel, Hoover's termination fee provision violates public policy and is unconscionable as a matter of law.

 Notwithstanding its immediate-payment requirement, several additional considerations lead us to conclude that Hoover's termination fee provision is unenforceable. In *Levine v. Bayne, Snell & Krause, Ltd.,* we refused to construe a contingent fee contract as entitling the attorney to compensation exceeding the client's actual recovery. 40 S.W.3d 92, 95 (Tex.2001). In that case, the clients purchased a home containing foundation defects, and stopped making mortgage payments when the defects were discovered. *Id.* at 93. They agreed to pay their lawyer one-third of "any amount received by settlement or recovery." *Id.* A jury awarded

the clients $243,644 in damages, but offset the award against the balance due on their mortgage, resulting in a net recovery of $81,793. *Id.* The lawyer sued to collect $155,866, a fee equaling one-third of the gross recovery plus pre- and post-judgment interest and expenses. *Id.* In refusing to interpret "any amount received" as permitting collection of a contingent fee exceeding the client's net recovery, we emphasized that the lawyer is entitled to receive the contingent fee " 'only when and *to the extent the client receives payment.'* " *Id.* at 94 (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 35). A reasonable client does not expect that a lawyer engaged on a contingent-fee basis will charge a fee equaling or, as in this case, exceeding 100% of the recovery[8] In *Levine,* we noted that " '[l]awyers almost always possess the more sophisticated understanding of fee arrangements. It is therefore appropriate to place the balance of the burden of fair dealing and the allotment of risk in the hands of the lawyer in regard to fee arrangements with clients.' " *Id.* at 95 (quoting *In re Myers,* 663 N.E.2d 771, 774–75 (Ind.1996)). We believe Hoover's termination fee provision is unreasonably susceptible to overreaching, exploiting the attorney's superior information, and damaging the trust that is vital to the attorney-client relationship.

 The Disciplinary Rules provide that a contingent fee is permitted only where, quite sensibly, the fee is "contingent on the outcome of the matter for which the service is rendered." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(d).

---

8. Hourly fee agreements and cases in which the prevailing party recovers attorney's fees from an opposing party do not implicate the concerns presented here. Thus, pursuant to statute or a contract between the parties, it is not uncommon for courts to approve fee-shifting awards that exceed the damages recovered by the client. *See, e.g., Hruska v. First*

*State Bank of Deanville,* 747 S.W.2d 783, 785 (Tex.1988) (upholding $12,570 fee where the client recovered $2,920); *Sibley v. RMA Partners, L.P.,* 138 S.W.3d 455, 458–59 (Tex.App.-Beaumont 2004, no pet.) (upholding $82,748 fee where the client stood to recover approximately $43,000).

Hoover's termination fee, if not impliedly prohibited by Rule 1.04(d), is directly forbidden by Rule 1.08(h), which states that "[a] lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for the client, except that the lawyer may ... contract in a civil case with a client for a contingent fee that is permissible under Rule 1.04." *Id.* 1.08(h)(2). Thus, even if Hoover's termination fee provision is viewed as transforming a traditional contingent fee into a fixed fee, it nonetheless impermissibly grants the lawyer a proprietary interest in the client's claim by entitling him to a percentage of the claim's value without regard to the ultimate results obtained.

Examining the risk-sharing attributes of the parties' contract reveals that Hoover's termination fee provision weighs too heavily in favor of the attorney at the client's expense. Specifically, it shifted to Walton the risks that accompany both hourly fee and contingent fee agreements while withholding their corresponding benefits. In obligating Walton to pay a 28.66% contingent fee for any recovery obtained by Parrott, the fee caused Walton to bear the risk that Parrott would easily settle his claims without earning the fee. But Walton also bore the risk inherent in an hourly fee agreement because, if he discharged Hoover, he was obligated to pay a 28.66% fee regardless of whether he eventually prevailed. This "heads lawyer wins, tails client loses" provision altered *Mandell* almost entirely to the client's detriment. Indeed, the only scenario in which Hoover's termination fee provision would benefit Walton is if he expected the value of his claim to significantly increase after discharging Hoover. In that case, Walton could limit Hoover's fee to 28.66% of a relatively low value, and avoid paying 28.66% of a much larger recovery eventually obtained with new counsel. Thus, it is conceivable that a client viewing the events in hindsight could find that the arrangement worked out to his benefit. At the time of contracting, however, the client has no reason to desire such a provision because the winning scenario is not only unlikely, but also entirely arbitrary in relation to its timing and occurrence. Moreover, to the extent the client believes the value of his claim will increase as a result of employing new counsel, a rational client would forego the representation altogether rather than agree to the provision. In sum, the benefits of Hoover's termination fee provision are enjoyed almost exclusively by the attorney.

Hoover's termination fee provision is also antagonistic to many policies supporting the use of contingent fees in civil cases. Most troubling is its creation of an incentive for the lawyer to be discharged soon after he or she can establish the present value of the client's claim with sufficient certainty. Whereas the contingent fee encourages efficiency and diligent efforts to obtain the best results possible, Hoover's termination fee provision encourages the lawyer to escape the contingency as soon as practicable, and take on other cases, thereby avoiding the demands and consequences of trials and appeals. Moreover, the provision encourages litigation of a subset of claims that would not be pursued under traditional contingent fee agreements.

Finally, Hoover's termination fee provision creates problems relating to valuation and administration, but not in the manner articulated by the court of appeals. The court of appeals viewed the parties' contract as empowering Parrott alone to determine the value of Walton's claims at the time of discharge, concluding that "[a]n agreement that leaves the damages to be paid upon termination by one party wholly

within the unfettered discretion of the other party is so one-sided as to be substantively unconscionable." 149 S.W.3d at 846 (citations omitted). We disagree, because nothing in their fee agreement indicates that Parrott retained such discretion. On the contrary, the contract is silent with respect to valuation. Nevertheless, its silence in that respect exposes an additional defect—the contract fails to explain how the present value of the claims will be measured. It does not describe how the nature and severity of the client's injuries will be characterized, nor does it state whether any other factors, such as venue, availability and quality of witnesses, the defendant's wealth and the strength of its counsel, and the reprehensibility of the defendant's conduct will apply to the calculation. Lawyers have a duty, at the outset of the representation, to "inform a client of the basis or rate of the fee" and "the contract's implications for the client." *Levine*, 40 S.W.3d at 96 (citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §§ 38(1), 18). We have stated that "to impose the obligation of clarifying attorney-client contracts upon the attorney 'is entirely reasonable, both because of [the attorney's] greater knowledge and experience with respect to fee arrangements and because of the trust [the] client has placed in [the attorney].'" *Levine*, 40 S.W.3d at 95 (quoting *Cardenas v. Ramsey County*, 322 N.W.2d 191, 194 (Minn.1982)) (alterations in original). For these reasons, the "failure of the lawyer to give at the outset a clear and accurate explanation of how a fee was to be calculated" weighs in favor of a conclusion that the fee may be unconscionable. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04 cmt. 8. And while experts can calculate the present value of a claim at the time of discharge, this extra time, expense, and uncertainty can be avoided under hourly billing and the traditional contingent fee, even in cases in which a

discharged attorney seeks compensation from a disgruntled client.

Our conclusion that Hoover's termination fee provision is unconscionable does not render the parties' entire fee agreement unenforceable. *See* RESTATEMENT (SECOND) OF CONTRACTS § 208 (1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."); *Williams v. Williams*, 569 S.W.2d 867, 871 (Tex.1978) (explaining that an illegal provision generally may be severed if it does not constitute the essential purpose of the agreement); *In re Kasschau*, 11 S.W.3d 305, 313 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (concluding that an unenforceable provision may be severed if the parties would have entered into the contract without it). Walton paid Hoover its contingent fee for settlements that Parrott negotiated with Texaco and El Paso Natural Gas, and Walton does not contend that this portion of the agreement is unconscionable. On the contrary, in his brief to the court of appeals, Walton argued in the alternative that Hoover was limited to recovering 28.66% of the $900,000 settlement reached in the Bass litigation and requested rendition of judgment in that amount. Severing the termination fee provision, the remainder of the fee agreement is enforceable. Thus, if Hoover were discharged without cause, it would be entitled to either its contingent fee or compensation in quantum meruit. *Mandell*, 441 S.W.2d at 847.

The court of appeals rendered a take-nothing judgment against Hoover, holding the entire fee agreement unenforceable and denying a recovery in quantum meruit because Hoover failed to present evidence

of the reasonable value of its services. 149 S.W.3d at 847. We agree that Hoover no longer has a claim for quantum meruit, but we disagree with the take-nothing judgment. In the trial court, Hoover sought to enforce the contract's termination fee provision. Our holding, however, severs the termination fee provision, leaving a contingent fee contract subject to *Mandell.* The jury (1) found that Walton did not comply with the contract and (2) failed to find that Walton had good cause to discharge Hoover. Under *Mandell,* therefore, Hoover was entitled to its contingent fee: 28.66% of $900,000, or $257,940. In the trial court, and again in his appellate brief, Walton argued that Hoover was entitled to only this amount, and Hoover requested this relief in the alternative in its brief to this Court.[9]

In the court of appeals, however, Walton challenged the factual and legal sufficiency of the evidence supporting the jury's finding on the good-cause issue. Because the court of appeals reversed and rendered judgment, it did not reach Walton's sufficiency points. Accordingly, we remand the case to that court for consideration of those issues.

## III

### Conclusion

Hoover's termination fee provision penalized Walton for changing counsel, granted Hoover an impermissible proprietary interest in Walton's claims, shifted the risks of the representation almost entirely to Walton's detriment, and subverted several policies underlying the use of contingent fees. We hold that this provision is unconscionable as a matter of law, and therefore, unenforceable. We affirm that part of the court of appeals' judgment reversing the trial court's judgment, but reverse its take-nothing judgment, and remand this case to the court of appeals for further proceedings. Tex.R.App. P. 60.2(a), (d).

Justice HECHT filed a dissenting opinion, in which Justice MEDINA and Justice WILLETT joined.

Justice HECHT, joined by Justice MEDINA and Justice WILLETT, dissenting.

I withdraw my dissenting opinion dated June 30, 2006 and substitute this one in its stead.

No rational plaintiff changes lawyers midway through a case in order to recover less, and John B. Walton, Jr. was not irrational. So when he retained what is now the law firm of Hoover Slovacek LLP to collect royalties for oil and gas produced on his 32,500–acre ranch for a contingent fee of 28.66% of any recovery, he must have reasoned that if he had to discharge the firm it would be to maximize recovery, in which event the firm should not receive a percentage of the final recovery and thereby benefit from services rendered by the new lawyers but should be paid only what the fee was worth at the time of discharge. Without an agreement on the subject, if Hoover Slovacek were discharged for good cause, it might have the right to be paid the value of its services

---

9. Because the trial court's judgment awarded Hoover the more favorable recovery under its termination fee provision, Hoover was not required to raise the alternative theory as a cross point on appeal. *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.,* 747 S.W.2d 785, 787 (Tex.1988). Hoover's contention that it is entitled to enforce its contingent fee arises from the court of appeals' judgment. It may be raised in this Court without having first filed a motion for rehearing in the court of appeals. Tex.R.App. P. 49.9; *see also Bunton v. Bentley,* 153 S.W.3d 50, 53 (Tex.2004).

rendered,[1] but if it were discharged without good cause, it would be entitled to its full contingent fee from the final recovery.[2] Walton and Hoover Slovacek agreed instead that if he terminated the representation, with or without cause, he would "immediately pay the Firm the then present value of the Contingent Fee". Hoover Slovacek would not receive a percentage of the final recovery if discharged without cause, and Walton would pay the value of the fee, which could take into account more than the time spent and thus might be more or less than the value of the services rendered by the firm based on an hourly rate.

What appears to have been a good-faith effort by lawyer and client to reach a fair arrangement for handling the difficult possibility of estrangement was, according to the Court, *unconscionable*, meaning that "a competent lawyer could not form a reasonable belief that the fee is reasonable."[3] This, of course, does not reflect very well on Hoover Slovacek or its distinguished counsel in this case, who have advocated the reasonableness of the fee, and the Court's condemnation of what might appear to be a rather innocuous fee agreement may also come as a surprise to a large number of other lawyers who have up until now considered themselves competent. Worse still, the Court says, the agreement violated public policy, which means, not that it was bad, but that it "contravene[d] some positive statute or some well-established rule of law".[4] The

---

1. *Compare Royden v. Ardoin*, 331 S.W.2d 206, 209 (Tex.1960) (holding that an attorney suspended from practice before completion of representation was not entitled to recover on the contract or for quantum meruit, but stating: "If an attorney, without just cause, abandons his client before the proceeding for which he was retained has been conducted to its termination, or if such attorney commits a material breach of his contract of employment, he thereby forfeits all right to compensation." (internal quotation marks omitted)), *and Kelly v. Murphy*, 630 S.W.2d 759, 761–762 (Tex.App.-Houston [1st Dist.] 1982, writ ref'd n.r.e.) (holding that an attorney who dismissed his client's lawsuit without authorization was not entitled to recover for quantum meruit), *with Rocha v. Ahmad*, 676 S.W.2d 149, 156 (Tex.App.-San Antonio 1984, writ dism'd) (holding that attorney discharged for good cause was nevertheless entitled to recover for quantum meruit, and stating: "If the former client pleads and proves good cause for discharge, ... then the attorney is not entitled to recover under the contract of employment. In such a case, the attorney may attempt to recover a fee for services rendered up to the time of discharge under quantum meruit.").

2. *Mandell & Wright v. Thomas* 441 S.W.2d 841, 847 (Tex.1969) ("In Texas, when the client, without good cause, discharges an attorney before he has completed his work, the attorney may recover on the contract for the amount of his compensation." (citing *White v. Burch*, 19 S.W.2d 404 (Tex.Civ.App.-Fort Worth 1929, writ ref'd); *White v. Burch*, 33 S.W.2d 512 (Tex.Civ.App.-Fort Worth 1930, writ ref'd); *Cottle County v. McClintock & Robertson*, 150 S.W.2d 134 (Tex.Civ.App.-Amarillo 1941, writ dism'd judgment cor.))). One might well think that the most the client would owe in such circumstances would be the contractual fee prorated for the services the lawyer actually performed. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 40 cmt. c (2000) ("Allowing a discharged or withdrawing lawyer to recover compensation under a fee contract with the client is sometimes more appropriate ... where the client discharges a contingent-fee lawyer without cause just before the contingency occurs, perhaps in order to avoid paying the contractual percentage fee.... [T]he contractual fee is prorated for the services actually performed...."). But that is not Texas law, and the parties in this case have not suggested it should be.

3. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(a) ("A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable.").

4. *Lawrence v. CDB Servs., Inc.*, 44 S.W.3d 544, 553 (Tex.2001) (" 'Public policy, some

Court does not actually identify a statute or rule of law that has been contravened, and truthfully, none has been. In fact, the agreement has done no devilry at all. To be sure, Walton and Hoover Slovacek have fought hard over how much is owed, the firm claiming at least $1.7 million (28.66% of $6 million, which Walton once may have thought his claims were worth), maybe more, while the client admits to owing no more than $257,940 (28.66% of the $900,000 his claims actually settled for), and maybe nothing at all. But fighting over an agreement does not make the agreement unconscionable and against public policy, or the number of valid agreements would be much smaller.

What does make an agreement unconscionable and against public policy, according to the Court, is not its terms, which seem fair enough in this case, or any consequence to the parties, as yet unrealized here, but what *might* happen if the agreement were made between other parties or in other circumstances. If a court can imagine circumstances in which an agreement *could be* unconscionable—and here, the Court has tried to list every conceivable way that could happen, and then some—it *is* unconscionable. Here are the seven reasons the Court gives for holding this termination fee agreement unconscionable and against public policy:

• *The agreement does not distinguish between discharges with and without cause.* True, but surely a lawyer and client can agree to a termination fee that avoids wrangling over whether discharge was with or without cause, given the intrinsic uncertainties in that issue. Walton

and Hoover Slovacek settled on a termination fee that Walton, at least, surely thought would be less than a percentage of the ultimate recovery, and the firm, perhaps, thought might be more than the value of services rendered at an hourly fee. Mere compromise is not unconscionable, but if it were, no matter here. Walton undertook to prove that he discharged Hoover Slovacek with cause but failed to convince the jury, so even if the agreement had drawn the distinction, he could not take advantage of it. At this point, the distinction is irrelevant.

• *If the contingent fee were worth more at the time of discharge than at the end of the case, it would be a bad deal for the client.* So it would, but a fee agreement is not unconscionable and against public policy merely because it could be a bad deal for the client. As noted at the outset, a rational plaintiff does not change lawyers to recover less, and if that is what Walton did, he has himself to blame. The Court criticizes this agreement because it would benefit the client only when the claim is improved by changing lawyers, but since the client is in control, benefit to the client should always be intended and, absent misjudgment, achieved. Moreover, there is no evidence in *this case* that Hoover Slovacek's contingent fee was ever worth more than it would have been at the end of the case. If the fee was worth as much at discharge as it would have been at the end, the agreement gave the firm only what Texas law would if there had been no termination clause, since it has not been established that discharge was for cause.

courts have said, is a term of vague and uncertain meaning, which it pertains to the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction con-

travenes some positive statute or some well-established rule of law.' "); *Town of Flower Mound v. Stafford Estates Ltd. Partnership,* 135 S.W.3d 620, 628 (Tex.2004); *Texas Commerce Bank, N.A. v. Grizzle,* 96 S.W.3d 240, 250 (Tex.2002);. *Churchill Forge, Inc. v. Brown,* 61 S.W.3d 368, 373 (Tex.2001).

Walton *could* have made a bad deal, but there is no evidence he *did.*

● *Ascertaining the value of a contingent fee mid-case is hard.* There is some tension between this argument and the previous one, which assumes that a contingent fee can be valued before the end of the case to the client's detriment. Actually, the value of a contingent fee mid-case may well be impossible to prove with sufficient certainty for recovery, even in a case like this one involving only economic damages. Walton's lawyer first demanded $58.5 million to settle, the defendants countered with $6 million and conditions, Walton demanded $6 million without conditions, the defendants offered $300,000, and the case finally settled for $900,000, due largely to new and unforeseen developments. Walton discharged Hoover Slovacek 22 months into a 42–month–long case. What was Hoover Slovacek's contingent fee worth at discharge? That question has been fully tried but has still not been answered—there is no evidence what a willing buyer would have paid a willing seller for a claim like Walton's the day he discharged Hoover Slovacek—and it may not be answerable. Even if the audit of royalty payments Walton commissioned had been completed, uncertainties remained in determining whether he had been underpaid. But the Court seems not to notice that Hoover Slovacek bears the burden of proving the value of its fee, and any difficulty in carrying that burden does not prejudice Walton, it benefits him.

● *A lawyer who knows that the value of a claim is declining has an incentive to misbehave, provoke discharge, collect more than he would in the end, and turn to more lucrative business.* This argument rejects what the previous one asserts, that the value of a contingent fee is hard to predict. But more importantly, the Court appears to assume a jurisdiction in which lawyers do not owe clients a fiduciary duty, the intentional breach of which is a tort remedied by actual and exemplary damages. A lawyer as wicked as the Court's imagination may be more deterred by the threat of punitive damages than the threat of a voided contract. In any event, no evidence in this case hints at anything even approaching this *pollo poco* nightmare.

● *The agreement required Walton to pay up at discharge.* But if there had been no agreement, Walton would undisputedly have been required to pay Hoover Slovacek at discharge the value of its services rendered. The impoverished client the Court hypothesizes—certainly not Walton—who could afford representation only on a contingent fee, would be required to pay for the value of the discharged lawyer's services at termination. To agree to what the law would otherwise provide can hardly be unconscionable. Even so, it *would in fact have been* no burden on Walton. He could have paid Hoover Slovacek, just as he paid his new lawyers $283,000 at an hourly rate. And in any event, in over nine years, Walton has not yet paid Hoover Slovacek one cent for prosecuting his claims against the Bass defendants.

● *The agreement violated professional rule 1.08(h) by allowing Hoover Slovacek to acquire an interest in Walton's claim other than by a contingent fee authorized by rule 1.04.* Here the circularity is dizzying. To restate the argument: if the agreement was unconscionable in violation of rule 1.04 of the Texas Disciplinary Rules of Professional Conduct, it gave Hoover Slovacek an interest in Walton's claim prohibited by rule 1.08(h), which excepts only interests created by an agreement valid under rule 1.04, which this agreement was not, if indeed it wasn't. If the termination fee was not unconscionable, rule 1.08(h) is

inapplicable, and if the termination fee was unconscionable, rule 1.08(h) is inconsequential. Either way, rule 1.08(h) is irrelevant.

● *A client should not reasonably expect a contingent fee to equal or exceed the recovery.* Certainly not, but even if that *could* ever occur with a termination fee like the one in this case, and it is not at all clear that it ever could, it *has not happened* in this case. Walton settled for $900,000, and there is no evidence that he owes Hoover Slovacek more than 28.66% of that amount. The Court notes that its concerns do not extend to hourly fee agreements, but it is not clear why only contingent fees are subject to abuse.[5]

In sum, the Court "believe[s] Hoover's termination fee provision is unreasonably susceptible to overreaching, exploiting the attorney's superior information, and damaging the trust that is vital to the attorney-client relationship."[6] Although I think the Court's arguments are strained at best, even if they had more substance, a fee agreement should not be voided as unconscionable and against public policy based merely on what *could* happen but was not intended and has not in fact occurred. It *could have happened* that Hoover Slovacek provoked its own discharge for nefarious reasons, or that Walton discharged Hoover Slovacek for cause, or that

when he did, the termination fee exceeded the contingent fee, or that he was somehow prejudiced by the difficulty in evaluating the termination fee, or that he had to pay before any recovery was realized, or that the fee exceeded his recovery. Any of these things *could have happened,* but *none did.* Walton and Hoover Slovacek anticipated exactly what occurred and tried to make suitable provision for it. Whether their agreement was unconscionable, and therefore abhorrent to public policy and void, should be determined by their initial expectations and the actual consequences, not on hyperbolic hypothesizing in hindsight. As the comment to rule 1.04 states:

> [F]ee arrangements normally are made at the outset of representation, a time when many uncertainties and contingencies exist, while claims of unconscionability are made in hindsight when the contingencies have been resolved.... Except in very unusual situations, therefore, the circumstances at the time a fee arrangement is made should control in determining a question of unconscionability.[7]

Agreements are unconscionable when they are not or cannot be proper, not when it is merely possible for them to be improper.

Again, it matters not whether the parties have behaved admirably throughout.

---

5. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 34 cmt. c (2000) ("Accordingly, the reasonableness of a fee due under an hourly rate contract, for example, depends on whether the number of hours the lawyer worked was reasonable in light of the matter and client. It is also relevant whether the lawyer provided poor service, such as might make unreasonable a fee that would be appropriate for better services, or services that were better or more successful than normally would have been expected....").

6. 206 S.W.3d at 563.

7. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04 cmt. 7; *see also* RESTATEMENT(THIRD) OF THE LAW GOVERNING LAWYERS § 34 cmt. c ("Although reasonableness is usually assessed as of the time the contract was entered into, later events might be relevant.... [E]vents not known or contemplated when the contract was made can render the contract unreasonably favorable to the lawyer or, occasionally, to the client.... To determine what events client and lawyer contemplated, their contract must be construed in light of its goals and circumstances and in light of the possibilities discussed with the client....").

Walton does seem to have had an inflated view of the value of his claims (about 900%), though perhaps no more than many clients, and he may not have had good cause to discharge Hoover Slovacek—at least he could not convince a jury he did. And Hoover Slovacek may have been overly aggressive, at first in pursuing the defendants (demanding $58.5 million to settle a $900,000 claim) and then in pursuing Walton (demanding millions for a legal fee worth $257,940). But Hoover Slovacek's lawyers are not here on disciplinary charges, and Walton is not applying for Client of the Year. An agreement is not unconscionable because a party acts unconscionably—and there is certainly no evidence that Walton or Hoover Slovacek did.

If the Court is serious about today's analysis, many more fee agreements and other contracts will be unconscionable. The Court says that "[h]ourly fee agreements ... do not implicate the [same] concerns" it has about the agreement in this case,[8] but they do. Fees based on hourly rates seemingly reasonable at the outset *could* end up being excessive in easily imaginable circumstances, but that mere potential does not invalidate an agreement.

But the Court may not be serious. It may be that today's decision will be limited to this one particular fee agreement in this one isolated situation, portending nothing for fee agreements in general.[9] If so, then the rules governing fee agreements will merely have a minor exception, and only the Court's authority to articulate general rules will suffer. Of course, the careful lawyer on a contingent fee can simply charge what the law allows for termination of representation without good cause: the full fee. The client will be penalized for changing lawyers and will pay for services not rendered, but it will not be unconscionable.

We have taken as given that the only fee a Texas lawyer is prohibited from charging is one that is illegal or unconscionable because that is what rule 1.04(a) of the Texas Disciplinary Rules of Professional Conduct provides.[10] In most states, lawyers cannot charge unreasonable fees;[11] not so in Texas. In Texas, a lawyer is

---

**8.** 206 S.W.3d at 563 n. 8.

**9.** *See County of Cameron v. Brown,* 80 S.W.3d 549, 565–566 (Tex.2002) (Hecht, J., dissenting) ("It may be, however—one cannot always tell for sure—that the Court does not really mean what it says.... [I]t may be that this case is just another 'restricted railroad ticket, good for this day and train only.'" (citing *Smith v. Allwright,* 321 U.S. 649, 669, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (Roberts, J., dissenting))).

**10.** Tex. Disciplinary R. Prof'l Conduct 1.04(a) ("A lawyer shall not enter into an arrangement for, charge, or collect an illegal fee or unconscionable fee.").

**11.** Alaska R. Prof'l Conduct Rule 1.5(a); Ariz. R. Prof'l Conduct Er 1.5(a); Ariz. R. Prof'l Conduct, Er 1.5(a); Ark. R. Prof'l Conduct, Rule 1.5(a), (e)(3); Colo. R. Prof'l Conduct Rule 1.5(a), (f); Colo. R. Civ. P. Ch. 23.3 (contingent fees), Rules 3, 7; Conn. R. Prof'l Conduct, Rule 1.5(a); Del. R. Prof'l Conduct, Rule 1.5(a); D.C. R. Prof'l Conduct Rule 1.5(a); Ga. R. Prof'l Conduct Rule 4–102, Rule 1.5(a); Haw. R. Prof'l Conduct Rule 1.5(a); Idaho R. Prof'l Conduct Rule 1.5(a); Ill. R. Prof'l Conduct Rule 1.5(a); Ind. R. Prof'l Conduct Rule 1.5(a); Kan. R. Prof'l Conduct Rule 1.5(a), (e) (court review); Ky. R. Prof'l Conduct SCR 3.130(1.5(a)); La. R. Prof'l Conduct Rule 1.5(a), (f)(5) (unearned fee/expense deposit/retainer provision); Md. R. Prof'l Conduct Rule 1.5(a); Minn. R. Prof'l Conduct Rule 1.5(a); Miss. R. Prof'l Conduct Rule 1.5(a); Mo. R. Prof'l Conduct Rule 4–1.5(a); Mont. R. Prof'l Conduct Rule 1.5(a); Nev. R. Prof'l Conduct Rule 155.1; N.J. Rules Prof'l Conduct RPC 1.5(a); N.M. R. Prof'l Conduct Rule 16–105(A); N.D. R. Prof'l Conduct Rule 1.5(a); Okla. R. Prof'l Conduct Rule 1.5(a); R.I. R. Prof'l Conduct Rule 1.5(a); S.C. R. Prof'l Conduct Rule 1.5(a); S.D. R. Prof'l Conduct Rule 1.5(a); Tenn. R. Prof'l Conduct Rule 1.5(a); Vt. R. Prof'l Conduct Rule 1.5(a);

prohibited only from charging a fee that a competent lawyer could not reasonably believe to be reasonable.[12] Of course, Texas law does not *award* lawyers unreasonable fees, so one could argue that notwithstanding rule 1.04(a), a lawyer suing to collect a fee must prove that it is reasonable, not merely that it is not unconscionable. In matters other than lawyer discipline, the Disciplinary Rules of Professional Conduct have been held to "provide guidelines and suggest the relevant considerations" without supplying the rule of decision,[13] and one could argue that the role of rule 1.04(a) in enforcing fee agreements is similarly limited.[14] But none of the parties here does.

The Court remands the case to the court of appeals to review the sufficiency of the evidence regarding the jury's failure to find that Walton discharged Hoover Slovacek for good cause. In the end, Hoover Slovacek may recover as much or more without the termination fee provision. This is certainly an odd way of applying unconscionability. I would enforce the termination fee agreement. Accordingly, I respectfully dissent.

VA. R. PROF'L CONDUCT Rule 1.5(a); WASH. R. PROF'L CONDUCT Rule 1.5(a); W. VA. R. PROF'L CONDUCT Rule 1.5(a); WIS. R. PROF'L CONDUCT SCR 20:1.5(a); and WYO. R. PROF'L CONDUCT Rule 1.5(a). *See also* ABA MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.5(a) (no "unreasonable" fees or expenses) (1983); ABA ETHICS 2000 REVISED MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.5(a), (e)(3) (2003); and RESTATEMENT OF THE LAW GOVERNING LAWYERS §§ 34–35 (contingent fees, incorporating § 34)(2000).

**12.** *See supra* note 2.

**13.** *In re Users System Services, Inc.,* 22 S.W.3d 331, 334 (Tex.1999); *In re EPIC Holdings,*

*Inc.,* 985 S.W.2d 41, 48 (Tex.1998); *National Medical Enterprises, Inc. v. Godbey,* 924 S.W.2d 123, 132 (Tex.1996); *Henderson v. Floyd,* 891 S.W.2d 252, 254 (Tex.1995) (per curiam); *Spears v. Fourth Court of Appeals,* 797 S.W.2d 654, 656 (Tex.1990); *Ayres v. Canales,* 790 S.W.2d 554, 556 n. 2 (Tex.1990).

**14.** *Cf. Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 205 (Tex.2002) (referring to Rule 1.04 to determine a permissible referral fee); *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex. 1998) (referring to Rule 1.04 for factors indicating reasonableness of attorney fee); *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex.1997) (same).