IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 26, 2008

Charles R. Fulbruge III
Clerk

No. 07-10900

In re: RONALD D. WELLS,

Debtor.

RONALD D. WELLS,

Appellant,

v.

RHONDA HUGHES; RONALD HUGHES, SR.,

Appellees.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:06-CV-1815

Before SMITH, WIENER, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Debtor Ronald Wells appeals the district court's affirmance of a bankruptcy court order finding one of his client fee contracts unconscionable and

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

requiring a partial refund to the clients.[1]  Because the bankruptcy court properly ordered the refund under the circumstances of this case, we AFFIRM.

I.

A jury convicted Hughes of money laundering, and he was sentenced to prison.  After his direct appeal failed, his trial counsel recommended Wells as an attorney to review the case and identify any grounds on which to attack the conviction or sentence.  The trial counsel paid Wells by the hour, and Wells identified a "slim hope"[2] for obtaining relief on a petition for writ of habeas corpus under 28 U.S.C. § 2255 (Supp. V 2005).  Wells communicated in a letter to the trial counsel (with a copy to Hughes's daughter, Rhonda Montee) that it would "be a very difficult argument to make successfully, and even if [the trial judge] grants this relief, the family and client should consider that the government will likely appeal."

On February 2, 1999, Hughes, acting through Montee, entered into the first of three contracts with Wells for legal representation (the "First Contract").  The First Contract was for the investigation and preparation of the habeas petition.  In exchange, the Hugheses paid Wells $125,000, in advance, with a $10,000 expense deposit.  The contract included a "no refund" provision that stated:

> Client further understands and agrees that should these matters be dismissed or settled in any manner, NO part of the Attorneys' fee is to be refunded to Client.  Because of Attorneys' commitment to handle this matter, Client further understands and agrees that

---

[1] The parties dispute whether Hughes's daughter, Rhonda Montee, was ever Wells's client.  She held a power of attorney for her father, and no one disputes her intense involvement in the control of the defense and the various transactions at issue.  Her signature appears on all three contracts, one expressly as client, and one, the Third Contract, more ambiguously.  Given the evidence in this case, we cannot conclude that the bankruptcy judge's award to "Plaintiffs" was in error.

[2] Interestingly, the ground Wells identified as giving a "slim hope" is not the same ground upon which habeas relief was ultimately granted by the trial court.

Attorneys' fees set out above will be considered by all parties as earned at the time of payment, and no part of that fee will be refunded to the Client.

Accordingly, Wells and several other attorneys prepared a habeas petition alleging nine issues. The magistrate judge agreed with Hughes's first issue and, on February 23, recommended to the district court that it vacate the conviction. On March 4, after the magistrate judge had given her recommendation, the Hugheses and Wells entered their second contract (the "Second Contract") for "[r]epresentation after Findings, Conclusions, and recommendations [sic] of U.S. Magistrate Judge." The contract continued:

> It is agreed that this employment is for the purpose of negotiating a settlement of the criminal sentence and/or seeking a sentence reduction to allow release and is in addition to the fee previously paid in contract dated February 2, 1998, between the same parties hereto. In the event a New Trial is granted and no settlement can be obtained, a separate fee shall be required prior to any representation in a new trial.

(emphasis added). Under this contract, the Hugheses made a series of payments totaling $150,000 with an additional $25,000 due in the event of an appeal. The contract contained the same "no refund" provision found in the First Contract. The Second Contract unequivocally obligates Wells to represent Hughes in connection with efforts to obtain a negotiated sentence reduction.[3]

After further proceedings on the habeas petition, the district court granted the relief on June 30 and vacated Hughes's conviction. It set September 20 as the date for a new trial and released Hughes on a personal recognizance bond. Under the Federal Rules of Appellate Procedure, the Government had until August 30 to appeal the district court's order granting relief. FED. R. APP. P.

---

[3] Wells was hopeful that he could negotiate a deal with the Government whereby Hughes would plead guilty and receive a sentence equal to time served (instead of the several years then remaining on his original sentence). In exchange, Wells would testify against his son-in-law, Montee's husband, in an administrative proceeding involving Mr. Montee's job as an FBI agent.

4(a)(1)(B).

On July 16, the Hugheses and Wells entered their third contract (the "Third Contract"), for "Representation after Granting of Writ and New Trial." It stated:

> It is agreed that this employment is for the purpose of representation in the above-referenced matter and is in addition to any fees previously paid and in no way changes the terms of prior agreements. The fee includes representation through all District Court proceedings but does not include a re-trial if the trial results in a hung jury.

(emphasis added). Thus, nothing in this contract purported to undo or alter Wells's pre-existing obligation under the Second Contract to provide representation in the sentence/plea negotiations. This contract required the Hugheses to pay Wells $300,000 for his services, with an additional $25,000 due in the event of an appeal after the new trial. Like the two previous contracts, the Third Contract included a "no refund" provision, but the terms were different:

> Client further understands and agrees that should these matters be dismissed or settled in any manner, NO part of the Attorneys' fee is to be refunded to Client unless this matter settles on or before August 23, 1999, in which event the total fee shall be $125,000. In the event a negotiated settlement occurs in regard to the forfeited two million dollars, a separate compensation agreement will entered into [sic]. Because of Attorneys' commitment to handle this matter, Client further understands and agrees that Attorneys' fees set out above will be considered by all parties as earned at the time of payment, and no part of the fee will be refunded to Client.

On August 27, 1999, the government appealed the grant of the writ of habeas corpus and the new trial. As a result of the appeal filing, the September trial was canceled. We reversed the grant of habeas relief and reinstated Hughes's conviction. United States v. Hughes, 230 F.3d 815, 822 (5th Cir. 2000). He returned to prison to serve the remainder of his sentence and, obviously, no new trial occurred.

More than three years later, on December 31, 2002, the Hugheses demanded the return of the $300,000 paid to Wells under the Third Contract, alleging that, because the new trial had never occurred, Wells did not earn the money. In March 2003, the Hugheses sued in state court seeking a declaratory judgment that the First and Third Contracts were unconscionable and therefore unenforceable and that Wells had breached both contracts, entitling them to $453,000 in damages.[4]

In April 2005, Wells filed for bankruptcy protection under Chapter 7 of United States Code Title 11. Wells included the Hugheses' claim for $453,000 as an unsecured and disputed claim. In March 2006, the bankruptcy court held that the Third Contract was unconscionable because the anticipated new trial had never occurred. Accordingly, the court reformed the contract and held that Wells was entitled to $135,000[5] and the Hugheses were entitled to a $165,000 refund. The court further held that the refund was a dischargeable unsecured claim.[6]

Wells appealed the bankruptcy court's ruling to the district court. The district court affirmed, and Wells filed this appeal. The Hugheses have not cross-appealed the dischargeability ruling or the partially adverse ruling on the amount of the debt; thus, we do not reach those issues here.

---

[4] In June 2003, the Hugheses filed grievances against Wells with the State Bar of Texas based on the same claims. The grievances were dismissed.

[5] This amount reflects the $125,000 Wells would have kept if the case were resolved before August 23 and an additional $10,000 the bankruptcy court deemed appropriate, though generous, for Wells's efforts from August 23 until the government filed its appeal on August 27.

[6] Somewhat cryptically, Appellee contends that although Wells appealed from the August 9 amended judgment, he failed to appeal from the "Order Granting the Debtor's Objection to the Claim" thus "waiving his right to contest the terms or effect of such order." Because that order was entered the same day as the amended judgment and grants the same relief, this contention is unavailing.

## II.

Wells contends the bankruptcy and district courts erred in concluding that the Third Contract was unconscionable. Like the district court, we review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. In re Hamilton, 125 F.3d 292, 295 (5th Cir. 1997). The court's determination that, under Texas law, the Third Contract was unconscionable is a conclusion of law that is based on findings of fact. See Ski River Dev., Inc. v. McCalla, 167 S.W.3d 121, 136-37 (Tex. App.–Waco 2005, writ denied).

Under Texas law, attorney fee contracts are not judged by general commercial standards: "When interpreting and enforcing attorney-client fee agreements, it is 'not enough to simply say that a contract is a contract. There are ethical considerations overlaying the contractual relationship.'" Hoover Slovacek LLP v. Walton, 206 S.W.3d 557, 560 (Tex. 2006) (quoting Lopez v. Muñoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 868 (Tex. 2000) (Gonzales, J., concurring in part and dissenting in part)). The attorney's duty of ethical conduct "is highest when the attorney contracts with his or her client or otherwise takes a position adverse to his or her client's interests." Id. at 560-61. At the time of the Third Contract, Wells was already Hughes's lawyer on the case in question. Thus, his conduct is subject to assessment as a fiduciary and to a presumption of unfairness that arises when a fiduciary enters into a transaction with his own client. See Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co., 20 S.W.3d 692, 699 (Tex. 2000) ("Contracts between attorneys and their clients negotiated during the existence of the attorney-client relationship are closely scrutinized. Because the relationship is fiduciary in nature, there is a presumption of unfairness or invalidity attaching to such contracts." (citations omitted)); Archer v. Griffith, 390 S.W.2d 735, 739 (Tex. 1964) ("The relation between an attorney and his client is highly fiduciary in nature, . . . . 'The burden of establishing its perfect fairness, . . . is thrown upon the

attorney, . . . . ' [This] general rule . . . applies to a contract or other transaction relating to compensation provided the attorney-client relationship was in existence at the time." (citations omitted)); see also Tex. Disciplinary R. Prof'l Conduct 1.04 cmt. 6, reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, art. 10, § 9 (Vernon 2005) (hereinafter "Rule 1.04 ") ("Once a fee arrangement is agreed to, a lawyer should not handle the matter so as to further the lawyer's financial interests to the detriment of the client.").

## III.

The Texas Supreme Court has relied upon the Texas Disciplinary Rules of Professional Conduct to provide the definition for unconscionability in the context of an attorney fee agreement. Hoover Slovacek LLP, 206 S.W.3d at 561 n.6 ("Although the Disciplinary Rules do not define standards of civil liability for attorneys, they are persuasive authority outside the context of disciplinary proceedings, and we have applied Rule 1.04 as a rule of decision in disputes concerning attorney's fees."). Under those rules, "A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable." Rule 1.04(a). "[I]n fee disputes between lawyer and client, a fee will not be approved to the extent that it violates [§ 34] even though the parties had agreed to the fee." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 34 cmt. a (2000).

Texas law is clear that a contract that places an undue burden upon a client's ability to change counsel can be unconscionable. Hoover Slovacek LLP, 206 S.W.3d at 562-63. Courts should scrutinize whether such agreements are unreasonably susceptible to overreaching and whether the risk-sharing attributes of such a contract weigh too heavily in favor of the attorney at the expense of the client. Id. at 563-64. As noted above, when a fee contract is negotiated during the course of representing the client in an ongoing matter, it is presumed to be unfair. Keck, 20 S.W.3d at 699; Archer, 390 S.W.2d at 739.

Thus, Wells had the burden of disproving the unfairness of his transaction with his client.  Keck, 20 S.W.3d at 699.

In his testimony before the bankruptcy court, Wells insisted that the Third Contract was for "representation" and not for the new trial, though he also claimed to be "on the hook" for the new trial if it ever occurred.  He claimed the Third Contract was to pay for services in securing Hughes's release through a negotiated plea arrangement.  His appeal brief continues the same argument. That argument is incredible in light of the fact that the Second Contract expressly covers representation in the "settlement" negotiations.  If Wells's testimony is true, the Third Contract is unconscionable because it covers services he was already obligated to provide and for which he had already been fully and generously compensated under the Second Contract.  Wells's own admission, then, about the goal that the funds were actually paid to accomplish is the most telling evidence of all against him and illustrates the one-sided nature of the contract.

Even if the Third Contract was designed to cover pretrial preparation and the new trial ordered by the district judge after the successful habeas, it still suffers from the taint of unfairness.  In this case, the bankruptcy court heard testimony from two criminal defense attorneys – George R. Milner, Sr. and Gary Alan Udashen – both of whom had participated in the Hughes representation, and both of whom the court described as "well-regarded . . . in Dallas."  Those attorneys testified that $300,000 would have been reasonable if the trial had occurred; they also stated that the fee was not reasonable for a trial that never occurred.  Both were critical of Wells's decision to treat the entire $300,000 as earned and to keep the money regardless of what happened later.

The evidence also showed that, at the time of contracting, Wells put undue pressure on the Hugheses to sign the Third Contract.  Montee testified that shortly after Hughes was released from prison on the grant of the writ, Wells

called a meeting and expressed to the Hugheses that it was imperative for them to sign the new contract so that Wells, Udashen, and one other attorney could divide the work and begin preparing for trial. Montee also testified that Wells told her that if she did not sign the agreement, she "could go look for another attorney, and that there was no attorney in Dallas that [she] would be able to get for anywhere near this on such short notice with all of the reading and everything else that . . . he had already done." The parties settled on $300,000 for Wells's and Udashen's services under the Third Contract. After the contract was signed but before the consideration was paid, Wells further pressured Montee by telling her that if she did not pay, he would seek to withdraw as trial counsel, that he believed that the judge (whom Wells represented was his close friend) would then revoke Hughes's personal recognizance bond, and that Hughes would be returned to prison pending trial. Even though Montee's and Wells's characterizations of this conversation differ, they both acknowledge that the conversation occurred and proceeded along these lines. This kind of undue pressure is completely inconsistent with the high duty Wells owed to his clients.

Not only did Wells put undue pressure on the Hugheses, but also the time pressure imposed was a fictional one – the attorneys knew there would be an appeal such that no trial would occur in September. Udashen testified that Wells was relying on him for most of the preparation work. Yet, Wells paid him nothing, and Udashen did nothing to prepare for the new trial. Udashen testified that he did not prepare for the new trial because he knew an appeal would be filed.[7]

Finally, it is inexplicable why Wells, as a fiduciary, would allow his client to enter into a contract with a "drop dead" date just one week before the true appellate deadline. The Third Contract specified August 23 as the date when

---

[7] Wells admitted that he filed only one pretrial motion (a motion for extension of time), because former trial counsel had already filed "every motion that anyone has ever dreamt up."

the entire $300,000 would become nonrefundable. Wells testified this date was "loosely tied" to the deadline for the Government to appeal the habeas ruling. He offers no other explanation for picking a date that was one week before the true appellate deadline, August 30. Udashen testified that Wells knew there would be an appeal because the Government's lawyer had said there would be. The filing of the appeal would cause the September trial setting to be vacated, eliminating the need to rush and the concomitant difficulty of finding other counsel that created the pressure to sign the Third Contract. Indeed, if the appeal were filed, Wells would have been required to resume work under the Second Contract to respond to the appeal.[8] Yet none of that was disclosed to the clients.[9]

In sum, attorney-fiduciary Wells entered into a contract with his existing clients during his continuing representation of their interests (the settlement negotiations) for services that he was already obligated to provide under an existing contract. Even if the Third Contract was for pretrial and trial services associated with the potential new trial, the evidence shows that Wells placed his clients in an unnecessarily pressured situation, performed little or no work under that contract, did not expect to perform much work under that contract in the immediate future, and failed to disclose material information to his

---

[8] In negotiating the Third Contract, Wells had a duty to disclose all conflicts of interest with his own self-interest. Tex. Disciplinary R. Prof'l Conduct 1.06(b)(2), (c). If an appeal were filed, Wells had a self-interest in seeing Hughes lose so that Wells would pocket the entire $300,000 without having to do any work. Yet he was the lawyer retained to defend the appeal under the Second Contract. We do not suggest that Wells deliberately lost the habeas appeal to profit personally, just that this inherent conflict should have been disclosed under the particular circumstances presented here. Disclosure obligations are fact intensive and we express no opinion about the need to make such a disclosure in other cases.

[9] Although the bankruptcy judge appeared to conclude that the Hugheses knew there would be no trial in September if an appeal were filed, no evidence was presented to that effect during the trial before that court. Even if the Hugheses knew this fact, it would not excuse Wells's conduct, without any reason, of entering into a contract using the hurry-up date of August 23, rather than the actual appellate deadline of August 30.

clients. This contract "weighs too heavily in favor of the attorney at the client's expense." Hoover Slovacek, LLP, 206 S.W.3d at 564.

Wells had the burden of disproving the unfairness of his transaction with his client. Archer, 390 S.W.2d at 739. He failed to do so. The evidence and Texas law support the bankruptcy court's determination that at least the second half of the Third Contract was unconscionable.

IV.

The judgment of the district court affirming the bankruptcy court is AFFIRMED.