**Dissenting Opinion Filed August 8, 2013**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-10-01133-CV**

_____

**ELIZABETH W. CELMER, Appellant**
**V.**
**CHARLES MCGARRY, Appellee**

**On Appeal from the 101st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-09-3023-E**

## DISSENTING OPINION

Before Justices O'Neill, FitzGerald, and Lang-Miers
Dissenting Opinion by Justice FitzGerald

It is not plausible that Celmer, an experienced loan officer, would expect McGarry, an experienced lawyer, to work for years on her case—and that McGarry would do so—without a written contingency agreement or without charge. This case is about money, pure and simple, and Celmer's refusal to pay McGarry, the one lawyer who won her case on appeal, then persisted in representing Celmer through a retrial and the subsequent appeals. Celmer argues there was no agreement to pay McGarry; but even if there were, it would not be enforceable because it was not in writing; but even if it were, it would be unconscionable.

The jury soundly rejected Celmer's position by finding that Celmer and McGarry agreed to a new fee agreement prior to the second trial, entitling McGarry to a 50% contingency fee

based on Celmer's entire recovery, plus $200 per hour, plus expenses. By rendering judgment for McGarry, the trial judge implicitly rejected Celmer's statute-of-frauds defense.

I would conclude that the evidence was legally and factually sufficient to support the rejection of Celmer's statute-of-frauds defense, and I would affirm the judgment in favor of McGarry on his breach-of-contract claim.

## A.    The live pleadings

The nature of McGarry's breach-of-contract claim is set forth clearly in his live pleading. In 2001, Celmer approached McGarry and begged him to take her appeal from an adverse judgment in her divorce case, which she had tried pro se. He agreed, and under their fee agreement Celmer agreed to pay McGarry 45% of her interest in the Norgasco stock, which would increase to 50% of the Norgasco stock if any filing were made in the Texas Supreme Court. Celmer also agreed to pay McGarry his expenses. McGarry won the appeal, and Celmer's ex-husband did file a petition for review in the Texas Supreme Court. *See Bufkin v. Bufkin*, No. 08-02-00025-CV, 2003 WL 22725522 (Tex. App.—El Paso Nov. 20, 2003, pet. denied) (mem. op.). But Celmer failed to pay all of the expenses of the appeal as agreed.

Once appellate proceedings were complete, the case returned to the trial court for a new trial. According to McGarry's live pleading, this is what happened next:

> As a result of the appellate victory, the parties agreed that the contingent fee should apply to the entire recovery, and . . . not just the Norgasco stock. Since it was clear that [Celmer] could not pay expenses, the defendant McGarry agreed to finance them until the end of the case. Since the original agreement had been clear that defendant McGarry would not represent [Celmer] in the trial court, [Celmer] offered to pay defendant McGarry an additional $200 per hour on remand, in addition to the contingent fee. Although this was less than defendant McGarry's customary rate, defendant McGarry accepted the agreement, since he was also receiving a contingent fee, and because it was anticipated that the additional hourly compensation would be minimal, since he was merely assisting another attorney on the case. The amended agreement between the defendant McGarry and [Celmer] was evidenced in writing by an exchange of electronic mail, each of which was electronically signed by the parties. . . . Although the parties contemplated putting this agreement in the form of a formal contract, no

> one has been able to locate such[ ]a document. . . . Celmer, however, has stated that she did sign a formal agreement reflecting the amended terms. In any event, the exchange of electronic mail sufficiently evidences an enforceable agreement.

McGarry's live pleading put Celmer on notice that McGarry was relying on both his exchange of emails with Celmer and on a lost writing to evidence the second contract.

McGarry represented Celmer in the litigation for several more years, including mandamus proceedings in the court of appeals and supreme court, *see In re Bufkin*, 224 S.W.3d 223 (Tex. App.—El Paso 2005, orig. proceeding [mand. denied]), a jury trial, and another appeal to the court of appeals and supreme court, *Bufkin v. Bufkin*, 259 S.W.3d 343 (Tex. App.—Dallas 2008, pet. denied).

Celmer pleaded the statute of frauds, without citing a specific statute or rule, as an affirmative defense to "McGarry's claims for attorney's fees and breach of contract."

## B. The findings under review in this appeal

The jury found in answer to Question Number 2 that Celmer and McGarry intended to be bound by an agreement for McGarry to receive "a) a contingent fee equal to 50 percent of Celmer's total recovery from the second trial; b) an hourly fee equal to $200 per hour for McGarry's time spent in connection with the second trial; and, c) reimbursement of expenses advanced by McGarry on Celmer's behalf in connection with the second trial."[1] There was no jury question asking the jury whether this agreement was in writing. By signing a judgment in favor of McGarry on his breach-of-contract claim, the trial judge implicitly found that this element of Celmer's affirmative defense of statute of frauds was resolved in McGarry's favor. *See* TEX. R. CIV. P. 279 (deemed findings in support of judgment).

---

[1] Question Number 4 was, "Was the agreement you have found in response to Question Number 2 fair and reasonable considering as a whole the circumstances existing at the time the agreement was made?" Question Number 5 was, "Did Celmer fail to comply with the agreement you found in response to Question Number 2?" Question Number 6 was, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate McGarry for his damages, if any, that resulted from Celmer's failure to comply with the agreement found by you in response to Question Number 2?" Thus, the charge made it clear to the jury that it had found that an agreement existed in answer to Question Number 2.

Celmer filed a motion for new trial in which she argued that she and McGarry did not reach a meeting of the minds as to a second agreement and that there was no writing sufficient to satisfy the writing requirement for contingency-fee agreements required by Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct. At the new-trial hearing, McGarry argued that the evidence showed that there could have been a second written contract and that "the jury probably believed that there was a second [written] contract. Ms. Celmer had the documents. Ms. Celmer had the files. Conveniently, no second agreement appeared, even though in one of her e-mails where she says she has a photographic memory, she recalled signing a second agreement." McGarry argued further, "There was a second [written] agreement. It was either destroyed or lost, either intentionally or unintentionally. We don't know." The trial judge overruled Celmer's motion for new trial by signed order.

## C. Celmer's briefing is inadequate to establish reversible error.

As previously noted, McGarry relied on two factual theories that the statute of frauds was satisfied: that he and Celmer executed a written agreement that was lost or destroyed, and that their emails satisfied the statute of frauds. Each theory was sufficient to support the judgment in McGarry's favor. But in her principal appellate brief, Celmer specifically addresses only the email theory. Otherwise, her brief contains only general assertions that there was no evidence to support the existence of a written agreement between her and McGarry. In my view, this is insufficient to challenge the specific factual theory of a lost written agreement. The failure to adequately brief an issue, either by failing to specifically argue and analyze one's position or by failing to provide authorities and record citations, waives any error on appeal. *In re B.A.B.*, 124 S.W.3d 417, 420 (Tex. App.—Dallas 2004, no pet.); *see also In re M.A.S.*, 233 S.W.3d 915, 924 (Tex. App.—Dallas 2007, pet. denied) ("Failure to provide substantive analysis waives an issue on appeal."). If an appellant fails to challenge an independent ground that supports the

–4–

judgment, we must affirm because any error identified by the appellant is harmless. *Oliphant Fin. LLC v. Angiano*, 295 S.W.3d 422, 423–24 (Tex. App.—Dallas 2009, no pet.).

I would reject Celmer's attack on the sufficiency of the evidence for inadequate briefing.

**D.      The evidence of a lost writing was legally and factually sufficient.**

One of McGarry's theories in this case is that his second fee agreement with Celmer was in writing but that the writing was lost or destroyed.  "A contract is not rendered unenforceable by the loss of the memorandum required by the statute [of frauds]." *Chakur v. Zena*, 233 S.W.2d 200, 202 (Tex. Civ. App.—San Antonio 1950, no writ).  "[W]here the memorandum required by the statute was duly made and signed by the party to be charged, and is afterward lost or destroyed, its contents may be proved by oral testimony in an action against such party." *Id.*; *accord EP Operating Co. v. MJC Energy Co.*, 883 S.W.2d 263, 267 n.1 (Tex. App.—Corpus Christi 1994, writ denied); 37 C.J.S. *Frauds, Statute of* § 219 (2008).  The proof of the lost memorandum must be clear and convincing. *EP Operating Co.*, 883 S.W.2d at 267 n.1; *Chakur*, 233 S.W.2d at 202.[2]  McGarry argued that the evidence supported the existence of a lost written agreement in his motion for entry of judgment, and he continues to assert this position on appeal.

The existence and terms of the written second contract are proved by evidence from two principal sources: an email written by Celmer in March 2009 in which she unequivocally asserted that there was a second written agreement, and McGarry's trial testimony in support of that agreement.  First, on March 2, 2009, Celmer wrote an email to McGarry stating the following:

> ***Charles there was a second written letter agreement related to you taking on as a divorce attorney*** after we discussed that you were to be involved and when Jo[e] withdrew for duplication of attorney purposes.:  $200 per hour is what we have agreed as you state, plus cost incurred by you related to my trial, if the cost was

---

[2] Some other jurisdictions also follow this rule.  *E.g.*, *Lutz v. Gatlin*, 590 P.2d 359, 361–62 (Wash. Ct. App. 1979).

not paid to the experts there would not be any assets nor trial to win nor loose [sic].

. . .

Jo[e] Amberson did not care to pay for anything so that is why you stepped in since the huge portion of 50% of the asset was to be awarded to you only for the appeal.  it [sic] was over a million dollar case.

. . .

We need to have theses [sic] documents present before I can have a feel for the numbers.  *I have signed both instruments at your office or faxed it to you, either way*.

*These are 2 instruments we have ever signed related to my case and you being paid, and you would base your calculation on:*
*1: Appellate*
*2. Rate of $200/HR as my divorce attorney*
*3. Hard cost. 26K*

So at this time my understanding is you have calculated all proposals from your memory since no letters can be located.

I have a photographic memory in general, but I would be hesitant to recall anything especially nuances if any in this important matter involving a lot of money.

. . .

*Our agreements were signed prior of you having any of my records at your office*.
All records were trasfered [sic] from Jo[e]'s office to yours after we signed papers.
Originally I brought all files to your old office after we signed a letter agreement.

I hope you can find these tomorrow to expedite the fee process this week considering Bufkin payoff estimate would be on the 3/16/09.

(Emphases added.)  Celmer was a senior loan officer for a mortgage company, so she was not an

unsophisticated client.  The trial judge was entitled to believe her unequivocal statements that a

second signed, written agreement existed.

Celmer's March 2, 2009 email was clear that she and McGarry had a second written fee

agreement, and that this agreement included terms entitling McGarry to a fee of $200 per hour

and his trial expenses. She did not mention the expanded contingency fee of 50% of her entire recovery as opposed to 50% of the recovery from the Norgasco stock, but McGarry supplied the evidence for this term. McGarry was asked on direct examination whether he remembered drawing up a new agreement after the conclusion of the first appeal. McGarry testified as follows:

> Actually, my initial recollection was that I had. I mean, well, not right then but soon thereafter. I actually—my first recollection was that there were two agreements. You know, at the end of the case, I couldn't find either one of them because I had given all the files back to the client, but—.

When McGarry's attorney then asked if there might be a second written agreement, McGarry answered as follows:

> My initial recollection was that there were two formal agreements, and actually Ms. Bufkin says also that her initial recollection was that there were two formal agreements. I couldn't find either one. At the end of the case, she found only this first one. And you know, she came back at me at the end of the case and said, hey, this is the only agreement we ever did. Which that wasn't what I recalled. Now—.

McGarry also testified what the terms of the second agreement were:

> We had an agreement. We changed the original agreement. The agreement was 50 percent of everything, plus $200 an hour for my time—which was at a discounted rate—and expenses. And that was the agreement that I recall. That was the agreement she recalled. We both recall there was a written agreement, but neither of us could find it.

On cross-examination, McGarry testified that his computer suffered a hard-drive crash and he lost several years' worth of documents, including the years when the second contract would have been executed. Celmer did not introduce any evidence contradicting McGarry's evidence about the hard-drive crash. And Celmer acknowledged that McGarry had returned twenty-eight boxes of documents to her by March 2009, so McGarry could not search those boxes for the missing written contract.

The foregoing evidence is more than enough to support the trial judge's implied finding that the agreement found by the jury in answer to Question Number 2 was in writing. There was additional evidence of the second agreement as well. After the remand by the El Paso Court of Appeals, McGarry retried the case in January and February 2006, and Celmer recovered approximately $300,000 in that trial. In March 2006, she said in an email to McGarry, "Of course $150K plus your fees is a great number for you now and maybe not important to get additional 400K to hustle with this issue for possibly 2 more years." This email demonstrates Celmer's belief that she owed McGarry half of her entire recovery, consistent with McGarry's testimony about the terms of the new agreement.[3] Similarly, in a July 2007 email to McGarry, Celmer wrote, "I am aware that I owe you 50 % of the recouped assets for the 1st appeal and the additional deivorce [sic] fees." Although these two emails do not directly address the writing requirement, they show Celmer's belief that McGarry was entitled to half of her recovery in the second trial, and thus they support the existence and terms of the new fee agreement.

There was other evidence tending to show that Celmer agreed to change the parties' original 2001 agreement. She testified that she and McGarry made a new agreement allowing her not to pay the expenses until the end of the case. She acknowledged that she did not complain when McGarry sent her an updated invoice in November 2005, which indicates that she herself believed that she owed McGarry money under an agreement different from the 2001 agreement.

It also bears mentioning that Celmer's trial counsel acknowledged that one interpretation of the evidence was that Celmer had destroyed or lost a second written agreement. At the hearing on Celmer's motion for new trial, Celmer's trial counsel argued:

---

[3] Celmer implausibly tried to deny the plain meaning of this email by testifying, "This is not what I'm saying, but that's what it says," and, "I'm not sure [why I wrote that '$150K plus your fees is a great number for you now']." McGarry testified that he understood Celmer's reference to "$150K" to mean "the 50 percent contingent fee on the jury's verdict."

We produced all the documents we were requested to produce. I never saw a document that even remotely approached the second agreement. And I will say that the suggestion that my client destroyed it or inadvertently couldn't find it would certainly be one interpretation. The other one would be that it was never prepared and never sent her and never signed by anybody.

The trial judge made some observations on the record at that same hearing:

The Court went to some lengths to charge the jury on the issue of whether a second contract was formed between Mr. McGarry and Ms. Celmer. The jury found that there was such a contract, and I remain of the opinion that the evidence was more than sufficient to support that conclusion. It's clear to the Court that the jury neither believed nor sympathized with Ms. Celmer.

It was the trial judge's prerogative to reject Celmer's statute-of-frauds defense in his deemed findings based on the evidence that the second agreement was in writing but had been lost.

Of course there was some contrary evidence as well. Celmer testified and flatly denied that she ever made a written agreement with McGarry to pay him $200 an hour or a 50% interest in all of the property she recovered. Accordingly, she testified that she owed him nothing except "the costs." And during a portion of his cross-examination, McGarry equivocated about the existence of a second written agreement. When asked whether he prepared a second fee agreement like the one he and Celmer had previously executed, he testified:

I cannot answer that clearly yes or no. My recollection was that I did. Her recollection was that I did. I have no record of it currently, and despite my requests to your client, I have not been able to locate one. And so I have concluded—or it is my belief that it is more likely than not that there wasn't a second written agreement and that we are both mistaken. But I can't categorically say that because, as I said, we both remembered that there was. It just hasn't shown up.

Celmer's counsel then said, "Okay. You said that it was more likely than not that there was not a second written agreement." McGarry responded:

I think that's my own personal conclusion, that—because I sent e-mails to your client saying, no, you know, we might have just exchanged e-mails and made our agreement that way. You know, that's entirely possible. And, certainly, that's the only evidence of the agreement I have been able to locate after getting your client's records.

But under the appropriate standards of review, after weighing all the evidence, I conclude that there was clear and convincing evidence that a second written agreement existed but had been lost or destroyed. The trial judge's implicit rejection of Celmer's statute-of-frauds affirmative defense was not so contrary to the weight of the evidence as to be clearly wrong and manifestly unjust.

**E.    The evidence of a written agreement concluded by email was also sufficient**

McGarry also argues that the parties' emails constituted an agreement that satisfied the statute of frauds by virtue of the Texas Uniform Electronic Transactions Act. The majority rejects his argument. I disagree.

Under the Texas Uniform Electronic Transactions Act, a legal requirement of a writing can be satisfied with an electronic record, and a legal requirement of a signature can be satisfied by an electronic signature. TEX. BUS. & COM. CODE ANN. § 322.007(c), (d) (West 2009). An electronic signature is "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." *Id*. § 322.002(8). The Act "applies only to transactions between parties each of which has agreed to conduct transactions by electronic means." *Id*. § 322.005(b). "Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." *Id*. Viewing the evidence as a whole, I conclude that McGarry and Celmer agreed to make their second fee agreement electronically, and that their emails support the jury's finding of the terms of that agreement.

The majority holds that there is no evidence that Celmer and McGarry agreed to conduct their second fee-agreement transaction electronically, focusing on emails in which Celmer indicated that she wanted McGarry to draw up an agreement for her to sign. I view the evidence differently. In PX 8, an email dated July 9, 2004, Celmer states, "I will be happy to sign another

–10–

contract with you and whatever work you will decide to do in my case for us you can bill me accordingly at the rate of $200.00 per hour. Your fees have to be paid after final distribution of proceeds . . . ." This shows that Celmer and McGarry had already discussed the terms of their new fee agreement, including his specific hourly rate and the deferral of payment. In PX 21, an email dated November 3, 2005, Celmer acknowledged receipt of McGarry's latest bill, his first in over a year. She expressed no surprise or objection at receiving his bill, which she would have done if she were still expecting to execute a signed, written agreement with McGarry instead of proceeding on the terms they had previously discussed in their emails. Then, after the case had been retried, Celmer sent McGarry an email on March 23, 2006 in which she expressed her dissatisfaction with the outcome but acknowledged, "Of course $150K plus your fees is a great number for you now and maybe not important to get additional 400K to hustle with this issue for possibly 2 more years." This statement makes sense only if Celmer believed that McGarry's contingency fee would be based on her entire recovery and that he was entitled to additional fees on top of that contingency fee. And this belief supports the inference that the parties had, at some point, agreed to transact their second fee agreement electronically.

I also rely on PX 12, which contains a March 2, 2009 email from McGarry to Celmer in which he says, "As for the hourly rate that I began charging after I took over for Joe Amberson, we made that agreement simply by exchanging emails." This is some evidence that the parties agreed to transact their second fee agreement electronically. Finally, there is the parties' course of dealing. Although Celmer made some statements in 2004 indicating that she wanted a written and signed addendum to the previous fee agreement, she did not insist on an agreement in that format when McGarry continued to represent her after the conclusion of the appeal, sent her billing statements, and even served as her trial counsel at the retrial of her case. The evidence

supports the proposition that Celmer and McGarry agreed to transact their second fee agreement electronically.

The majority also holds that there is no evidence of an electronic record that is sufficient to encompass all the terms of the agreement found by the jury. I disagree. The key components of that agreement as found by the jury are (1) the expansion of McGarry's contingency fee from 50% of the Norgasco stock to 50% of Celmer's entire recovery, (2) an additional deferred hourly rate of $200 per hour, and (3) expenses for trial. Celmer acknowledged the deferred hourly rate in her email of July 9, 2004. She acknowledged the expansion of McGarry's contingency fee in her post-trial email of March 23, 2006, when she wrote, "Of course $150K plus your fees is a great number for you now . . . ." Celmer's reference to $150K after the jury verdict of $302,010 makes sense only if McGarry's 50% contingency-fee rate were applied to Celmer's entire recovery and not just the Norgasco stock. Celmer also acknowledged the new fee arrangement in her email of July 11, 2007, when she wrote, "I am aware that I owe you 50 % of the recouped assets for the 1st appeal and the additional deivorce [sic] fees." She referred to "the recouped assets" and not just the Norgasco stock, and she again acknowledged McGarry's entitlement to additional fees as well. Finally, in her email of March 2, 2009, Celmer acknowledged that she owed McGarry $200 per hour as her "divorce attorney," plus "Hard Cost. 26K," which other evidence established was the amount of McGarry's expenses for the trial. Although Celmer did not mention the contingency fee in this email, she had already alluded to it in her previous emails, and the jury was entitled to conclude that, considering all the emails together, the true agreement between McGarry and Celmer was what McGarry claimed: 50% of Celmer's entire recovery, plus $200 per hour and expenses.

Accordingly, I conclude that there was sufficient evidence of an electronic agreement between Celmer and McGarry that satisfied the statute of frauds and incorporated the terms

–12–

found by the jury. The trial judge did not err by rendering judgment on the verdict in favor of McGarry on his breach-of-contract claim.

**F.  Unconscionability and public policy**

Celmer argues in the alternative that the second fee agreement is unenforceable because it is unconscionable and violates public policy. The majority concludes that McGarry failed to establish that the fee he sought under the second agreement was reasonable, but it rejects Celmer's contention that he should forfeit his entire fee. I would conclude that Celmer's argument that the second fee agreement was unconscionable is without merit.[4]

Whether a fee agreement is contrary to public policy and unconscionable at the time it is formed is a question of law. *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006). Whether a particular fee amount or contingency percentage charged by an attorney is unconscionable under all the relevant circumstances of the representation is an issue of fact. *Id.* at 561. Under the Texas Disciplinary Rules of Professional Conduct, a fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable in light of all relevant circumstances, including several factors spelled out in Rule 1.04(b). *See id.* at 561–62 n.7 (citing TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G, app. A). These factors include the time and labor required, the novelty and difficulty of the questions presented, the skill required to perform the legal services properly, the amount involved and the results obtained, the time limitations imposed by the client or the circumstances, the lawyer's experience, reputation, and ability, and whether the fee is fixed or contingent. *See id.*

---

[4] Although the trial judge rendered judgment for McGarry on his claim for breach of the second fee agreement, the judge did not award McGarry all of the $276,390.37 in damages found by the jury. The judge reduced the amount to $208,816.37, stating on the record that any fee in excess of that would be unconscionable. McGarry perfected a cross-appeal but subsequently waived any challenge of the trial judge's reduction of the damages awarded.

–13–

Celmer argues that it was unconscionable for McGarry to charge her both a 50% contingency fee based on her entire recovery and $200 an hour because that fee "ensure[d]" that she would receive little or nothing at the conclusion of the case. McGarry responds that the fee was not unconscionable, and in his appellate brief he describes the work he performed on Celmer's case:

> He represented Celmer for nine years without payment, financing the case, and reached the Supreme Court of Texas on three separate occasions. The case required a review of properties in four different states, the preparation of historical appraisals for properties in three different states, including two privately held companies. Both Bufkin and Celmer filed personal bankruptcies at various times during the litigation, as did one of Bufkin's privately held companies. The case actually lasted long enough that Celmer was able to file bankruptcy and obtain a discharge (including a discharge of most of her legal fees) on two separate occasions.

It was fair to expand the contingency fee's base from the Norgasco stock to the whole of Celmer's recovery because the retrial involved proving the value of several other assets, including some real estate, in addition to the Norgasco stock, all of which McGarry financed. McGarry testified that when Celmer first sought his services, she went to his office, got on her knees and begged him to take her case. Celmer did not controvert that testimony. McGarry testified that Celmer asked him to appeal a divorce decree that had been rendered after a trial in which she was pro se. She had been represented by three different law firms in sequence in the years leading up to the trial, but at trial she was pro se. Moreover, she was in bankruptcy and had no money, so if McGarry took her case, he had to take it on a contingency fee and be willing to advance substantial expenses. McGarry testified that in their first meeting Celmer voluntarily offered him 50% just to appeal her case. While Celmer testified that she and McGarry reviewed the value of the properties and the court records together during that meeting, McGarry testified that the only documents he viewed prior to signing the original contract were the divorce decree and the prenuptial agreement, neither of which assigns any value to the properties. McGarry

–14–

testified that he was not able to review the trial transcript or prenuptial rulings until after he had taken the case, and that the only property Celmer seemed to be concerned with was the Norgasco stock. When asked why the contingency was limited to this one asset, McGarry explained that, because Celmer only seemed concerned with the stock, he limited the issues on appeal to just the interpretation of the contract and the valuation of the Norgasco stock. This allowed him to reduce expenses for Celmer associated with the appeal as he did not have to submit the entire clerk's record; only the relevant portions of the record were necessary to file with the appellate court. He also testified that taking the appeal was extraordinarily risky because all he could do on appeal was potentially win her a new trial and a chance at winning some money; he was not in a position to win Celmer a money judgment in the appeal itself. The appeal was also going to be a difficult one to win because of the broad discretion that trial judges enjoy in dividing the marital estate.

The original fee agreement gave McGarry a 45% contingency fee interest in Celmer's interest in the Norgasco stock. That interest increased to 50% if any filing was made in the Texas Supreme Court in the appeal. This contingency arrangement, which is common in contracts of this kind, was reasonable, particularly in light of its limitation to a single asset; contingency-fee agreements normally extend to all assets recovered. The agreement also expressly limited McGarry's role to the appeal, excluding any proceedings on remand.

McGarry took the case on appeal and won a reversal of the adverse judgment. Celmer's ex-husband did unsuccessfully attempt to appeal to the Texas Supreme Court. Thus, McGarry was entitled to a 50% contingency fee in the Norgasco stock under the original contract. Notably, although Celmer was supposed to pay McGarry the expenses associated with the appeal, which were about $3,500, she paid him only $1,000.

McGarry's involvement in the case continued after remand. He had already earned his entire fee relative to the Norgasco stock under the first agreement, so the parties negotiated a new agreement. Celmer proposed to increase McGarry's percentage of her recovery, but McGarry told her he thought it would be unethical for him to seek any additional percentage, and he proposed a deferred hourly rate instead. Celmer agreed to pay McGarry 50% of her entire recovery.

The contingency fee must also be understood in context. There were four properties at issue after the remand. McGarry's legal fee for work previously performed was based on one of these four specific properties, the Norgasco stock, and his fee was already earned when he won Celmer's appeal. Once McGarry began fronting the expenses for the retrial, he was increasing his risk by spending money to prove asset valuations in support of recoveries in which he had no interest under the first agreement. Thus, because McGarry was spending both time and money to litigate the values of additional properties beyond the Norgasco stock, it was reasonable to expand the base of his contingency fee to include Celmer's entire recovery. In addition, he set an hourly rate, and Celmer was responsible for reimbursing expenses.

The hourly rate of $200 an hour was a reduced rate from McGarry's normal rate of $240 or $250 an hour. McGarry intentionally reduced his rate because he was under the impression that he would only be working as needed to assist the lead attorney, and would not be spending significant resources on the trial. He believed at the time of the second agreement that he would not make a significant amount of money from the hourly fee, and that charging a reduced hourly fee in addition to the contingency would be reasonable. Even Celmer herself testified that the rate was "irrelevant" and that she had no problem with the hourly fee.

There was evidence of several factors that support the reasonableness of this fee structure. McGarry testified that the issues were very complex, and some of them were issues of

–16–

first impression. The retrial of the case would be expensive, requiring experts to perform historic appraisals of various pieces of property, and McGarry was agreeing to advance payment of substantial expert witness fees. It was a difficult case to prove, because Celmer's case depended on proving that assets had increased in value, which was speculative.

McGarry also testified to his superior qualifications, such as over twenty-eight years of law practice, his board certification in appellate law, and his past service as Chief Justice of the Court of Appeals. He performed extensive work after remand, including handling a mandamus proceeding that was also appealed to the Texas Supreme Court. At first, Celmer was also represented by a family-law attorney named Joe Amberson, but eventually he withdrew and McGarry became her only trial attorney. Amberson testified at trial that Celmer "had very strong opinions that at times had to be dealt with," and that "at times present[ed] problems." Once Amberson withdrew, McGarry resumed sending monthly bills to Celmer so that she would know her current status, and she never complained until just before her opponent, Bufkin, was going to pay off the judgment.

McGarry devoted substantial time and effort to preparing the case for trial, such as hiring experts and going to property inspections with property appraisers. Celmer herself testified that McGarry put a lot of work into the case and went to court for "all the hearings." McGarry also tried the case, which took five days. All totaled, McGarry billed Celmer for 337.87 hours for the work he performed on the case after the first appeal was over. The trial resulted in judgment for $302,010. The trial court also awarded prejudgment interest, which the court of appeals reversed on appeal because McGarry had not pleaded for prejudgment interest. Additionally, McGarry successfully prevented Celmer's ex-husband from recouping $64,000 that he had paid to Celmer as attorneys' fees before the first trial of the case, which she had not been entitled to under the parties' prenuptial agreement. Significantly, if McGarry were limited to recovering under his

–17–

first fee agreement with Celmer, he would have recovered no contingency fee, because there was no recovery based on the value of Norgasco stock. But under the expanded second fee arrangement, he was able to recover some fees because the jury did find in Celmer's favor on two other assets that were litigated in the second trial.

Celmer's ex-husband decided to pay the judgment off, but Celmer objected to his writing a check payable jointly to her and McGarry. Celmer's ex-husband ultimately paid the judgment amount into the registry of the court so that Celmer and McGarry could litigate their respective claims to the money. Celmer also did not pay McGarry any of the expenses he had fronted for the second trial, which were about $23,000. Joe Amberson, who had represented Celmer for a time after the remand, was paid for his work out of the registry of the court. In her pleading in this case, Celmer asserted that McGarry should recover nothing on his claim against her; on the witness stand, she took the position that McGarry was entitled to recover nothing from the money in the registry of the court "except the costs." Her conduct during the trial also led the judge to excuse the jury so that he could order her to stop giving nonresponsive answers to questions, on pain of contempt. In closing arguments, the parties took opposite positions, with McGarry arguing for and Celmer arguing against the existence of the second fee agreement.

Given all the facts, particularly the uncertainty that there would be any recovery at all, the difficulty of the issues, the financial risk McGarry assumed in fronting the expenses, the time he spent on the case over the course of seven years, and his qualifications, Celmer did not show that the second fee agreement was unconscionable or against public policy. It may be true that enforcement of the second fee agreement would substantially reduce Celmer's recovery. But as the trial judge remarked during the hearing on Celmer's motion for new trial, "If Ms. Celmer is down to no money left, it's basically because of her own insistence on attempting to stiff her own lawyer and continue litigation."

After reviewing all the relevant circumstances, I conclude that the fee agreement that the jury found to exist in answer to Question Number 2 was not unconscionable.

## G.     Conclusion

For the foregoing reasons, I respectfully dissent from the majority's decision reversing the trial court's judgment in McGarry's favor on his breach-of-contract claim arising from his second fee agreement with Celmer.

101133F.P05

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE